# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 12, 2008

Charles R. Fulbruge III
Clerk

No. 06-11422

KORNMAN & ASSOCIATES INC, as tax matters partner for Valiant
Investments 99-100, LP, a TEFRA Partnership

                                    Plaintiff-Appellant

v.

UNITED STATES OF AMERICA

                                    Defendant-Appellee

-------------------------------------------------------------------------------------------

COLM PRODUCER INC, as tax matters partner for GMK-GMK II, LP,
a TEFRA Partnership

                                    Plaintiff-Appellant

v.

UNITED STATES OF AMERICA

                                    Defendant-Appellee

-------------------------------------------------------------------------------------------

ETTMAN FAMILY TRUST I, a 5-percent group of Valiant Investments 99-
100, LP, a TEFRA Partnership

                                    Plaintiff-Appellant

v.

UNITED STATES OF AMERICA

                                    Defendant-Appellee

-----------------------------------------------------------------------------------------

ETTMAN FAMILY TRUST I, a partner of GMK-GMK II, LP,
a TEFRA Partnership

Plaintiff-Appellant

v.

UNITED STATES OF AMERICA

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, DeMOSS, and SOUTHWICK, Circuit Judges.

DeMOSS, Circuit Judge:

In these consolidated TEFRA partnership proceedings,[1] the Government argues that the Appellants attempted to create an enormous, artificial tax loss that is devoid of any economic content by using the short sale variant of the "Son of BOSS" tax shelter.[2] Through a pre-arranged series of transactions involving

---

[1] "TEFRA" is an acronym for the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324 (1982), and it was enacted "to improve the auditing and adjustments of income tax items attributable to partnerships." Alexander v. United States, 44 F.3d 328, 330 (5th Cir. 1995). TEFRA established "a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level." Callaway v. Comm'r, 231 F.3d 106, 108 (2d Cir. 2000); see generally I.R.C. §§ 6221–6234.

[2] "BOSS" is an acronym for "Bond and Option Sales Strategy" and refers to an abusive tax shelter. Christopher M. Pietruszkiewicz, Of Summonses, Required Records and Artificial Entities: Liberating the IRS from Itself, 73 MISS. L.J. 921, 921 n.2 (2004). Son of BOSS is a variation of the slightly older BOSS tax shelter. Jade Trading, L.L.C. v. United States, 80 Fed. Cl. 11, 57 n.83 (2007). Although there are several variants of the Son of BOSS tax shelter (e.g. the short sale variant and the offsetting option variant), they all rely on the same common principles. Id. "'Son of BOSS' uses a series of contrived steps in a partnership interest to generate artificial tax losses designed to offset income from other transactions."

the short sale of Treasury Notes (T-Notes) and subsequent transfers between a trust, two limited partnerships (LPs), and an individual, the Ettman Family Trust (the Trust) reported a short-term capital loss of approximately $102.6 Million on its 1999 tax return despite the fact that it only suffered an economic loss of approximately $200,000 in connection with those transactions.[3] Because non-corporate taxpayers can carry an unused capital loss forward to succeeding taxable years until it is exhausted, the trust used this artificial capital loss in 1999 to offset its legitimate income and capital gains in 2000 and 2001.

On September 25, 2003, the Internal Revenue Service (IRS) mailed notices of final partnership administrative adjustment (FPAA) to Kornman & Associates, Inc. (K&A), the tax matters partner of Valiant Investments 99-100, L.P. (Valiant), and to Colm Producer, Inc. (Colm), the tax matters partner of GMK-GMK II, L.P. (GMK). On December 23, 2003, K&A and Colm filed timely petitions for readjustment of partnership items in the district court. See I.R.C. § 6226(a)(2). On February 19, 2004, the Trust filed a timely petition for readjustment of partnership items of both LPs. The district court granted the Government's motion for summary judgment and dismissed the actions with prejudice on December 1, 2006. The Appellants filed a timely notice of appeal.

Because we conclude that the obligation to close a short sale is a liability for purposes of I.R.C. § 752, we affirm the judgment of the district court.

I. Facts

A.    The Participants

---

Pietruszkiewicz, supra, at 981 n.3. In IRS Notice 2000-44 ("Tax Avoidance using Artificially High Basis"), which was published on September 5, 2000, the IRS alerted taxpayers that the Son of BOSS scheme had been "listed" as an abusive tax shelter. 2000 WL 1138430; see also IRS Chief Counsel Notice 2003-020, IRS CCN CC-2003-020, 2003 WL 24016805 (June 25, 2003).

[3] All dollar figures are rounded in this opinion.

All of the participants in this pre-arranged series of transactions were connected to Gary Kornman, an attorney who marketed tax shelters to wealthy individuals. The Trust was organized for the benefit of Kornman and his descendants, and Kornman was its sole trustee in 1999. Valiant's general partner was K&A, and GMK's general partner was Colm. Kornman was the sole shareholder of both K&A and Colm. Brian Czerwinski, who ultimately purchased GMK's interest in Valiant, worked for the Heritage Organization, L.L.C. (Heritage), of which Kornman was the sole shareholder. Heritage filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Texas on May 17, 2004.

B.    The Transactions

"Like many tax shelters it was complex in detail but simple in principle . . . ." Cemco Investors, L.L.C. v. United States, 515 F.3d 749, 750 (7th Cir. 2008). On December 23, 1999, the Trust opened a brokerage account at Donaldson, Lufkin & Jenrette (DLJ) with a cash deposit of $2 Million. On December 27, 1999, the Trust used this deposit as margin and executed a short sale of $100 Million (face value) of T-Notes. This meant that the Trust borrowed the T-Notes from DLJ and then sold them on the open market. This short sale generated cash proceeds of approximately $102.5 Million, which was deposited in the Trust's brokerage account. After the completion of the short sale, the Trust's brokerage account consisted of approximately $104.5 Million in cash, comprised of the $2 Million initial deposit and the $102.5 Million short sale proceeds, plus an obligation to replace the borrowed property (i.e. return in-kind T-Notes to DLJ). The money in the brokerage account could not be withdrawn until the Trust returned the borrowed T-Notes to DLJ.

On the same day that it executed the short sale, December 27, 1999, the Trust transferred the brokerage account to Valiant in return for a 99.99% limited partnership interest in Valiant. By acquiring the brokerage account,

Valiant assumed the obligation to replace the borrowed T-Notes. On December 28, 1999, the Trust transferred its interest in Valiant to GMK in return for a 99.99% limited partnership interest in GMK. The Trust then owned a 99.99% limited partnership interest in GMK, which owned a 99.99% limited partnership interest in Valiant, which owned the brokerage account consisting of $104.5 Million in cash and the obligation to replace the borrowed T-Notes.

On December 30, 1999, GMK sold its interest in Valiant to Czerwinski for a promissory note in the amount of $1.8 Million. Czerwinski assumed the obligation to close the short sale. The price that Czerwinski paid for Valiant reflected the reality that most of the cash in the brokerage account would be used to close the short sale. On that same day, December 30, 1999, the short sale was closed through the acquisition of T-Notes in three separate transactions at a total cost of approximately $102.7 Million, including accrued interest. These transactions were reported on the Trust's brokerage account statement. According to the Government, Czerwinski did not have any authority over this account; Kornman always remained the signatory.

C.    The Tax Treatment of the Transactions

Although partnerships do not pay federal income tax, see I.R.C. § 701, they are required to file annual information returns reporting the partners' distributive share of income, gain, deductions or credits. Weiner v. United States, 389 F.3d 152, 154 (5th Cir. 2004). The individual partners then report their distributive share on their federal income tax returns. Id.; see also I.R.C. § 702.

On its partnership return for 1999, GMK reported a short-term capital loss of $102.7 Million from the sale of its partnership interest in Valiant. It computed this loss by subtracting its purported outside basis in Valiant of $104.5 Million from the purported sales price of $1.8 Million. GMK did not treat Czerwinski's assumption of Valiant's obligation to replace the borrowed T-Notes

as part of the amount realized on the sale of its partnership interest, and GMK's outside basis in the partnership interest was not adjusted or reduced based on the obligation to replace the shorted T-Notes.

GMK's reported loss of $102.7 Million enabled the Trust, a 99.99% partner in GMK, to offset its future capital gains. On Schedule D (Capital Gains and Losses) of its 1999 tax return (Form 1041), the Trust reported a short-term capital loss of $102.6 Million as its pro rata share of GMK's loss. I.R.C. § 1211(b) limited the deduction of capital losses to the lower of $3,000 or the excess of capital losses over capital gains. Having no capital gains in 1999, the Trust deducted $3,000 of its loss. It then carried over the remaining loss to 2000. See I.R.C. § 1212(b).

On its 2000 tax return, the Trust used the capital loss carryover to offset $562,000 in short-term capital gains and $123,000 in long-term capital gains. This offset reduced the Trust's net capital loss to $101.9 Million. The Trust then claimed a capital loss deduction of $3,000 on its 2000 tax return and carried forward the remaining loss to 2001. On its 2001 tax return, the Trust used this capital loss carryover to offset short-term capital gains of $1.1 Million and long-term capital gains of $585,000.

D.    The Cross-Motions for Summary Judgment

In their motion for summary judgment, the Appellants relied upon I.R.C. § 1233 in arguing that the obligation to close a short sale is a "contingent liability," which does not constitute a liability for purposes of I.R.C. § 752. Second, the Appellants argued that the transaction was valid under the economic substance doctrine. Third, the Appellants argued that Treasury Regulation § 1.701-2(b), which was relied upon by the IRS to recharacterize the transaction, was invalid and unconstitutional. Fourth, the Appellants argued that Treasury Regulation § 1.752-6 does not apply to this case, is invalid because it exceeded the scope of the Congressional grant of authority, is invalid because

it is impermissibly retroactive, and is unconstitutional under the Due Process Clause of the Fifth Amendment.

In response, the Government argued that the obligation to close a short sale is a liability for purposes of I.R.C. § 752. Second, the Government argued that Treasury Regulation § 1.752-6 requires that the obligation to close a short sale must be treated as a liability that reduces the Trust's outside basis in Valiant. Third, the Government argued that Treasury Regulation § 1.701-2, the Partnership Anti-Abuse Rule, was valid and allowed the IRS to recast the transaction as a sale of the brokerage account by the Trust, rather than a sale by GMK of its interest in Valiant, which purportedly owned the brokerage account. This recharacterization would result in a disallowance of the non-economic portion of GMK's loss. Fourth, the Government argued that the Appellants were not entitled to summary judgment because genuine issues of material fact existed regarding the applicability of the economic substance and step-transaction doctrines.

E.    Deposition Testimony

Czerwinski testified that he did not have any contractual relationship with DLJ regarding the brokerage account, and Kornman remained the signatory. Prior to depositing the $2 Million in the brokerage account, Kornman had asked Czerwinski to be the ultimate purchaser of Valiant. Kornman told Czerwinski that he wanted the transaction to close in 1999.

Ed Ahrens, an attorney who helped draft the opinion letter on which Kornman allegedly relied, testified that the groundwork for the tax shelter was conceived and fully blueprinted nearly a year before the transaction occurred, with the understanding that "if structured properly, there would be a significant tax benefit out of it." According to James McBain, another attorney, the key element to the potential tax losses was the sale of Valiant to Czerwinski, and if Kornman had chosen to have GMK close out the short position rather than

7

transfer Valiant to Czerwinski, the $102.6 Million tax loss would not have existed.

David DeRosa, one of the Government's experts, concluded that the short sale was no more than a coin flip on the short-term behavior of the U.S. Treasury Market. The risk was minimal and so was the chance of meaningful gains or losses. The purported assignment of the brokerage account to Valiant as of December 27, 1999 in all likelihood never occurred, and such transfer was not consistent with industry practice.

## F.    District Court Proceedings

The district court held that "[a] plain reading of section 752 indicates that GMK should have treated the obligation to replace the borrowed T-Notes as a liability under section 752." Colm Producer, Inc. v. United States, 460 F. Supp. 2d 713, 715 (N.D. Tex. 2006). In particular, the district court concluded that Czerwinski's assumption of GMK's share of this liability should be treated as an additional amount realized on the sale under section 752(d). Id. at 716. In reaching this conclusion, the district court relied upon the definition of "liability" contained in BLACK'S LAW DICTIONARY. Id. at 715. It also relied upon (1) Revenue Ruling 95-26, and (2) Salina Partnership, L.P. v. Commissioner, 80 T.C.M. (CCH) 686 (Nov. 14, 2000), 2000 WL 1700928, both of which held that an obligation to close a short sale is a liability under section 752. Colm Producer, 460 F. Supp. 2d at 715-16. The district court rejected the Appellants' contingent liability argument. Id. at 716. Because it held that the obligation to replace borrowed securities in a short sale is a liability, the district court did not address the additional arguments raised by the parties. Id. at 717.

## II. Analysis

## A.    Standard of Review

The district court granted summary judgment for the IRS. We review a district court's order granting summary judgment de novo, applying "the same

legal standards that the district court applied to determine whether summary judgment was appropriate." Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 433-34 (5th Cir. 2005). Summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." Sheline v. Dun & Bradstreet Corp., 948 F.2d 174, 176 (5th Cir. 1991).

B.    The Basics of Short Selling

A short sale is a sale of securities that are not owned by the seller. Provost v. United States, 269 U.S. 443, 450-51 (1926). "Where the traditional investor seeks to profit by trading a stock the value of which he expects to rise, the short seller seeks to profit by trading stocks which he expects to decline in value." Zlotnick v. TIE Commc'ns, 836 F.2d 818, 820 (3d Cir. 1988). The Third Circuit described a short sale as follows:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk. There is no time limit on this obligation to cover.[4]

---

[4] "A genuine securities short seller, who borrowed the security she has delivered, may hold her position as long as she is able to meet her margin calls—indefinitely, if she has the

"Selling short," therefore, actually involves two separate transactions: the short sale itself and the subsequent covering purchase.

Id.; see also James W. Christian, Robert Shapiro, & John-Paul Whalen, Naked Short Selling: How Exposed are Investors?, 43 HOUS. L. REV. 1033, 1041-42 (2006) (describing a traditional short sale). Although the Third Circuit was addressing the short sale of stocks in Zlotnick, the basic principles that it describes are equally applicable to the short sale of T-Notes.

In this case, the Trust's short sale of $100 Million (face value) of T-Notes on December 27, 1999 generated sale proceeds of $102.5 Million. The covering transaction occurred on December 30, 1999, when Czerwinski purportedly executed the covering transaction and acquired the borrowed T-Notes for $102.7 Million, resulting in a short-term capital loss of approximately $200,000, i.e. the excess cost of acquiring the replacement securities over the proceeds from the sale of the borrowed securities. However, the Trust reported a short-term capital loss of $102.6 Million on its tax return.

C.    Statutory Interpretation

This case requires statutory interpretation of the partnership taxation provisions of the Internal Revenue Code (the Code). At the time that this transaction occurred, during December 1999, there was no statutory definition of "liability" for purposes of section 752, and the IRS had not formally promulgated a definition in its treasury regulations.[5]

---

financial wherewithal to withstand a significant rise in the price of the security." Richard D. Friedman, Stalking the Squeeze: Understanding Commodities Market Manipulation, 89 MICH. L. REV. 30, 45 n.36 (1990).

[5] In 1989, the IRS published proposed regulations under I.R.C. § 752 that included a definition of liability; however, this definition was excluded, without explanation, when revised regulations were finalized in 1991. Prop. Treas. Reg. § 1.752-1T(g), 53 Fed. Reg. 53,143, 53,150-51 (Dec. 30, 1988). According to the IRS, "[t]his change was made only for the purpose of simplification and not to change the substance of the regulation." IRS Field Service

"A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning." Wallace v. Rogers (In re Rogers), 513 F.3d 212, 224 (5th Cir. 2008) (quotation marks omitted). We are authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress. Lamie v. United States Tr., 540 U.S. 526, 534 (2004); Johnson v. Sawyer, 120 F.3d 1307, 1319 (5th Cir. 1997). "Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history." Carrieri v. Jobs.com, Inc., 393 F.3d 508, 518-19 (5th Cir. 2004); see also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).

The Government argues that the obligation to close a short sale falls within the plain meaning of the term "liability" because "one who borrows securities in a short sale has a fixed, legal obligation to return the borrowed property." See BLACK'S LAW DICTIONARY 932 (8th ed. 2004) (defining liability as "[t]he quality or state of being legally obligated or accountable" and "[a] financial or pecuniary obligation; debt"). In a short sale, the borrower has a fixed, legal obligation to return in-kind securities to the broker, not money. See Zlotnick, 836 F.2d at 820. According to the Government, the short seller's obligation to replace the borrowed property is fixed at the time of borrowing, and "the borrower's unconditional obligation to replace the borrowed property remains

Advisory, 1997 WL 33313960 (Nov. 21, 1997). In 2003, the IRS published proposed regulations containing a similar definition of liability, which was adopted in 2005. Prop. Treas. Reg. § 1.752-1(a)(1)(ii), 68 Fed. Reg. 37,434, 37,436 (Proposed June 24, 2003); Treas. Reg. § 1.752-1(a)(4)(i) (Effective May 26, 2005). Under current Treasury Regulation § 1.752-1(a)(4)(i), which applies to liabilities incurred or assumed by a partnership on or after June 24, 2003, the obligation to close a short sale would constitute a liability for purposes of section 752.

unchanged" despite subsequent fluctuations in the market value of the underlying security.

Whereas the Government focuses on the idea that the obligation to return in-kind T-Notes was a fixed obligation at the time that the Trust contributed the brokerage account to Valiant, the Appellants focus on the idea that the value of that obligation is not fixed at the time of the contribution. Because this value is contingent and indefinite, the Appellants argue that the obligation is not a liability for purposes of section 752.

This case cannot be resolved simply by referring to the definition of "liability" in BLACK'S LAW DICTIONARY. Although the Trust was "legally obligated" to return in-kind securities to DLJ at the moment the short sale was initiated on December 27, 1999, the value of this "pecuniary obligation" at the time the Trust contributed the brokerage account to Valiant is not obvious. Indeed, the Appellants central argument is that the obligation to close a short sale is a "contingent liability" that falls outside the purview of section 752. The Internal Revenue Code deals with dollars, and the basis adjustment provisions of section 752 presume that the value of the liability is ascertainable. In this case, we believe that the obligation to close a short sale is a liability for purposes of section 752, and the value of this liability is equal to the initial proceeds of the short sale. This conclusion is not compelled by the plain language of the statute; rather, we reach it by adopting the reasoning espoused by the IRS in several revenue rulings.

We have previously relied on revenue rulings to define a term in the Code when the statute is silent, the plain language is ambiguous, and the legislative history is uninstructive. See Foil v. Comm'r, 920 F.2d 1196, 1201 (5th Cir. 1990).[6] Because the Code, the regulations, and the legislative history do not

---

[6] Section 752, as well as many other partnership provisions of Subchapter K, was enacted as part of the Internal Revenue Code of 1954. See Act of August 16, 1954, Pub. L. No.

provide a "precise and comprehensive" definition of liability, "we next look to the Commissioner's interpretation" as reflected in IRS revenue rulings.[7] Foil, 920 F.2d at 1201; see also St. David's Health Care Sys. v. United States, 349 F.3d 232, 239 (5th Cir. 2003) ("A recent IRS revenue ruling provides a starting point for our analysis.").

Before we discuss the substance of these revenue rulings, we must address the level of deference we owe to them. "Revenue Rulings do not have the presumptive force and effect of law but are merely persuasive as the Commissioner's official interpretation of statutory provisions." Sealy Power, Ltd. v. Comm'r, 46 F.3d 382, 395 (5th Cir. 1995). Nevertheless, we usually "accord significant weight to the determination of the IRS in its revenue rulings." St. David's Health Care Sys., 349 F.3d at 239 n.9. In this circuit, revenue rulings are "entitled to respectful consideration" and are generally "given weight as expressing the studied view of the agency whose duty it is to carry out the statute." Foil, 920 F.2d at 1201 (quotation marks omitted). We will disregard a ruling if it "conflicts with the statute it supposedly interprets, with the statute's legislative history, or if [it] is otherwise unreasonable." Id. In examining the reasonableness of the IRS's interpretation of an undefined

---

591, 68A Stat. 3, 251. The legislative history does not address the meaning of the term "liability." It merely explains that section 752 was intended to deal with the effect of a partner's assumption of partnership liabilities and the partnership's assumption of a partner's liabilities. See S. REP. NO. 83-1622, at 405 (1954), as reprinted in 1954 U.S.C.C.A.N. 4621, 5047; accord H.R. REP. NO. 83-1337, at S236-237 (1954), as reprinted in 1954 U.S.C.C.A.N. 4017, 4376-4377.

[7] Because the Government is relying on these three revenue rulings to define a term in a federal statute, not an IRS regulation, the concept of Seminole Rock deference is not implicated. See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945) (an agency's interpretation of its own regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation"); United States v. Mead Corp., 533 U.S. 218, 246 (2001) (Scalia, J., dissenting) ("[T]he Court leaves untouched today[] [the principle] that judges must defer to reasonable agency interpretations of their own regulations."); Ali v. Gonzales, 435 F.3d 544, 546 (5th Cir. 2006).

statutory term, we will certainly consider whether the definition contained in the revenue ruling comports with the plain meaning of the term and avoids absurd results. Cf. Johnson, 120 F.3d at 1319. This position is consistent with our previous statement that "any deference extended to a revenue ruling evaporates in the face of clear and contrary statutory language." Estate of McLendon v. Comm'r, 135 F.3d 1017, 1023 n.10 (5th Cir. 1998); see also Comm'r v. Schleier, 515 U.S. 323, 336 n.8 (1995) (stating that revenue rulings "may not be used to overturn the plain language of a statute").

Both the IRS and the Fifth Circuit have stated that revenue rulings are entitled to less deference than treasury regulations. See McLendon, 135 F.3d at 1024 (revenue rulings are "clearly less binding on the courts than treasury regulations"); 26 C.F.R. § 601.601(d)(2)(v)(d) ("Revenue Rulings . . . do not have the force and effect of Treasury Department Regulations . . ., but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose."). Despite this fact, the Government argues that revenue rulings should be entitled to Chevron deference, meaning that we would be required to follow them unless the IRS's interpretation of the statute is "arbitrary, capricious, or manifestly contrary to the statute." Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). Given the prominent role that revenue rulings play in our subsequent analysis, we feel compelled to address this argument. Cf. McLendon, 135 F.3d at 1023-24 & n.12 (noting that the Supreme Court has been "conspicuously silent" regarding the applicability of Chevron deference to revenue rulings).

After careful consideration, we conclude that revenue rulings are not entitled to Chevron deference, and we will continue to apply our previous standard. The Government acknowledges that revenue rulings are not promulgated pursuant to the notice-and-comment procedures of the

14

Administrative Procedures Act (APA).[8]  See John F. Coverdale, Court Review of Tax Regulations and Revenue Rulings in the Chevron Era, 64 GEO. WASH. L. REV. 35, 79 (1995).  Although notice-and-comment rulemaking is not the sine qua non of Chevron deference, see Mead Corp., 533 U.S. at 230-31, other Supreme Court precedent suggests that revenue rulings are not entitled to Chevron deference.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000); Davis v. United States, 495 U.S. 472, 484 (1990).

The Government has not identified "other circumstances reasonably suggesting that Congress ever thought of [revenue] rulings as deserving the [Chevron] deference claimed for them here." Mead, 533 U.S. at 231; see also Kristin E. Hickman, Coloring Outside the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements, 82 NOTRE DAME L. REV. 1727, 1804 n.365 (2007) (noting that taxpayers who disregard revenue rulings are judged under a more lenient standard for purposes of the underpayment penalty than those taxpayers who file a return inconsistent with a treasury regulation); Coverdale, supra, at 87 ("It is implausible that Congress intended to grant the Treasury authority to formulate binding policies in this informal format.").

"[A] particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-27.  Even assuming that revenue rulings satisfy the first prong of the Mead test, see I.R.C. § 7805(a), they clearly fail the second.  Unlike treasury regulations, the IRS does not invoke its authority to make rules with the force

---

[8] The IRS does occasionally request comments on proposed revenue rulings in the Internal Revenue Bulletin.  See, e.g., Announcement 95-25, 1995-14 I.R.B. 11, 1995 WL 107761 (April 3, 1995).  This appears to be the exception rather than the rule.

of law when promulgating revenue rulings.  26 C.F.R. § 601.601(d)(2)(v)(d). Although both treasury regulations and revenue rulings are ultimately authorized at the same level of the IRS and the Department of Treasury, see Treas. Dep't Order No. 111-2, 1981-21 I.R.B. 18, 1981 WL 127095 (May 26, 1981), and both are published, see Treas. Reg. § 601.601(d)(2)(i)(a), we believe that the lack of notice-and-comment and the IRS's own divergent treatment of treasury regulations and revenue rulings is dispositive of the deference issue. See Mead, 533 U.S. at 230 ("Thus, the overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication."); Christensen, 529 U.S. at 587 ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference."); Coverdale, supra, at 86 ("By choosing to issue a Revenue Ruling rather than a regulation, the IRS in effect announces that it does not intend to exercise its authority in a way that would make Chevron deference appropriate.").

Furthermore, other circuit courts have uniformly held that revenue rulings are not entitled to Chevron deference.[9]  Aeroquip-Vickers, Inc. v. Comm'r, 347 F.3d 173, 181 (6th Cir. 2003); Omohundro v. United States, 300 F.3d 1065, 1069 (9th Cir. 2002); Del Commercial Props., Inc. v. Comm'r, 251 F.3d 210, 214 (D.C. Cir. 2001); First Chicago NBD Corp. v. Comm'r, 135 F.3d 457, 459 (7th Cir. 1998); Linda Galler, Judicial Deference to Revenue Rulings: Reconciling Divergent Standards, 56 OHIO ST. L. J. 1037, 1063-68 (1995) (reviewing the

---

[9] Some cases and commentators have noted that the Sixth Circuit afforded Chevron-like deference to revenue rulings in the early 1990s.  See, e.g., Telecom*USA, Inc. v. United States, 192 F.3d 1068, 1073 & n.8 (D.C. Cir. 1999) ("Chevron-like" deference) (citing Johnson City Med. Ctr. v. United States, 999 F.2d 973, 975-76 (6th Cir. 1993)); Galler, supra, at 1071 (Chevron deference) (citing Johnson City and CenTra, Inc. v. United States, 953 F.2d 1051, 1056 (6th Cir. 1992)). In Aeroquip-Vickers, the Sixth Circuit held that the CenTra line of cases was abrogated by the Supreme Court's decisions in Christensen and Mead.  347 F.3d at 180.

deference given to revenue rulings by the circuit courts pre-1995); see Coverdale, supra, at 82 n.333 (same).

Post-Mead, the various circuit courts addressing this issue have held that revenue rulings are entitled to Skidmore deference. See, e.g., Aeroquip-Vickers, 347 F.3d at 181. In Mead, the Supreme Court affirmed the continued vitality of Skidmore deference, which gives an agency's interpretation "some deference whatever its form, given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." Mead, 533 U.S. at 234 (citation and quotation marks omitted). Reasonable agency interpretations that do not involve notice-and-comment carry "at least some added persuasive force" and may "seek a respect proportional to [their] power to persuade." Id. at 235 (citations and quotation marks omitted). We can discern no appreciable difference between our previously enunciated standard and the Skidmore standard. See Sealy Power, 46 F.3d at 395 (revenue rulings are "merely persuasive"); Foil, 920 F.2d at 1201 (revenue rulings are "given weight as expressing the studied view" of the IRS) (quotation marks omitted). We believe that our existing jurisprudence regarding the level of deference owed to revenue rulings is fully compatible with Skidmore, and we apply that standard today.[10]

---

[10] Our subsequent analysis will also require consideration of various treasury regulations. Because the Appellants do not challenge the validity or applicability of any of these regulations, we need not address the level of deference applicable to them post-Mead. Compare Snap-Drape, Inc. v. Comm'r, 98 F.3d 194, 197 (5th Cir. 1996) (holding that "legislative" treasury regulations are given Chevron deference, but "interpretive" treasury regulations are not), with Swallows Holding, Ltd. v. Comm'r, 515 F.3d 162, 169 (3d Cir. 2008) (holding that all treasury regulations are entitled to Chevron deference), and Hosp. Corp. of Am. & Subsidiaries v. Comm'r, 348 F.3d 136, 140 (6th Cir. 2003) (same); see also Kristin E. Hickman, The Need for Mead: Rejecting Tax Exceptionalism in Judicial Deference, 90 MINN. L. REV. 1537, 1556-59 (2006) (noting that the circuit courts are split over whether Chevron deference should apply to judicial review of all treasury regulations); 5 U.S.C. § 553(b)(3)(A) (exempting "interpretative rules" from the notice-and-comment procedures of the APA).

Because Revenue Rulings 88-77, 95-26, and 95-45 are not entitled to Chevron deference, we must consider whether they have the power to persuade. The degree of deference owed to a particular revenue ruling will depend upon several disjunctive factors: "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); see also Foil, 920 F.2d at 1201 (identifying other factors). For the reasons discussed below, after taking into account these factors, we believe that these three revenue rulings should be afforded "significant weight." See St. David's Health Care Sys., 349 F.3d at 239 n.9.

One factor which gives a revenue ruling its power to persuade is its reasonableness. See Foil, 920 F.2d at 1201. We are particularly struck by the absurd result that would arise if we accepted the Appellant's argument that the obligation to close a short sale is not a liability for purposes of section 752. We are reluctant to adopt any definition of liability that would defeat the manifest intent of Congress and would allow the Trust to continue its conspicuous raid on the Treasury through the use of this tax shelter.[11]

Before we begin our excursion into Subchapter K, we would be remiss if we did not comment on the elephant in the room. The Trust acknowledges that it only suffered a $200,000 economic loss in connection with these transactions,

---

[11] Because we are reviewing this case at the summary judgment stage, we express no opinion on the fact-bound issue of whether this particular transaction is invalid under the economic substance or step-transaction doctrines. See Compaq Computer Corp. v. Comm'r, 277 F.3d 778, 781 (5th Cir. 2001). But see True v. United States, 190 F.3d 1165, 1176 (10th Cir. 1999) (holding that the applicability of the step-transaction doctrine can be decided at the summary judgment stage in some cases). We simply find that the Commissioner's desire to define the term "liability" in a manner that prevents a taxpayer from deducting non-economic losses is imminently reasonable for purposes of Skidmore deference. See ACM P'ship v. Comm'r, 157 F.3d 231, 252 (3d Cir. 1998) ("Tax losses such as these . . . which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); Treas. Reg. § 1.165-1(b).

yet it claimed a $102.6 Million tax loss on its return. The Trust used this fake loss in 1999 to offset over $2 Million in legitimate income and capital gains in 2000 and 2001. The Appellants' premeditated attempt to transform this wash transaction (for economic purposes) into a windfall (for tax purposes) is reminiscent of an alchemist's attempt to transmute lead into gold.

## D. Calculation of GMK's Outside Basis and Amount Realized

The Government argues that the obligation to close a short sale is a liability for purposes of section 752, and the value of this liability is equal to the initial proceeds of the short sale. On Schedule D of its Form 1065, GMK stated that its outside basis in its partnership interest in Valiant was $104.5 Million. Both the Government and the Appellants agree that this figure is correct. The parties, however, arrive at the same figure by relying on different sections of the Code.

A partnership and its partners do not recognize a gain or loss if the partner contributes property to the partnership in exchange for a partnership interest. I.R.C. § 721(a). In exchange for the contribution, the partner receives a partnership interest with an outside basis that is equal to "the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution."[12] Id. § 722. GMK calculated its outside basis by treating both the $2 Million initial deposit and the $102.5 Million short sale proceeds as cash that was contributed to the partnership under section 722, resulting in an outside basis equal to the cash contribution. See Treas. Reg. § 1.722-1. Because GMK concluded that the obligation to close a short sale was not a liability, it did not rely on section 752 to adjust its outside basis in Valiant.

---

[12] A partner's basis in his partnership interest is called his "outside basis," and a partnership's basis in its assets is referred to as its "inside basis." See Kligfeld Holdings v. Comm'r, 128 T.C. 192, 195-96 (2007).

The Government agrees that the $2 Million initial deposit and the $102.5 Million short sale proceeds were cash contributions that increased GMK's outside basis in Valiant by the total amount of the contribution. However, the Government also believes that GMK's outside basis must be adjusted under section 752.

A partner's outside basis is affected by the partner's share of partnership debt. "[A]ny decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership," which will reduce the partner's outside basis in the partnership interest. Id. §§ 752(b), 705(a)(2), 733(1). Conversely, any increase in the partner's share of partnership liabilities shall be considered as a contribution of money by such partner to the partnership, which will increase the partner's outside basis in the partnership interest. Id. §§ 752(a), 705(a)(1). When calculating the partner's outside basis, sections 752(a) and (b) must be read together. Any decrease in a partner's share of individual liabilities under section 752(b) is netted against any increase in his share of partnership liabilities arising from the same transaction under section 752(a); only the net increase or decrease triggers a deemed contribution or distribution of cash. See Treas. Reg. § 1.752-1(f).

GMK has a substituted basis in Valiant that is equal to the Trust's original outside basis in Valiant. When the Trust contributed the brokerage account to Valiant, it contributed $104.5 Million in cash and an obligation to close the short sale. Assuming that the obligation to close a short sale is a liability, the Trust's outside basis in Valiant after the transfer of the brokerage account is equal to the $104.5 Million cash contribution (per section 722) minus the $102.5 Million liability assumed by Valiant (per section 752(b)) plus the $102.5 Million share of partnership liability attributable to the Trust (per section 752(a)). Because the Trust owned a 99.99% interest in Valiant, the

amount of liability assumed by Valiant was completely offset by the Trust's share of that liability.[13] See Treas. Reg. § 1.752-1(g), Ex. (1).

Although the Government's use of section 752 does not reduce GMK's outside basis in Valiant below $104.5 Million, it does attribute a 99.99% share of the partnership liability to GMK. In contrast, by ignoring section 752, GMK claimed a $104.5 Million outside basis in Valiant on its tax return without claiming its corresponding share of the $102.5 Million partnership liability. Based on this reasoning, GMK claimed that it only realized $1.8 Million on the sale, which should not be increased because GMK was not relieved of any liability recognized under section 752 when it sold Valiant to Czerwinski.

Under the entity approach, a sale of a partnership interest is treated as a disposition of a unitary capital asset, and the transferor generally recognizes gain or loss equal to the difference between his amount realized and his outside basis. See I.R.C. §§ 741, 742, 1001. In the case of a sale of a partnership interest, liabilities are treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships. Id. § 752(d). Thus, the amount realized by a partner who transfers his partnership interest includes not only cash and the fair market value of any other property received but also the transferor's share of partnership liabilities assumed by the transferee. See Treas. Reg. §§ 1.752-1(h), 1.1001-2(a)(1), Ex. (3); see also Comm'r v. Tufts, 461 U.S. 300, 308-09 (1983) ("When encumbered property is sold or otherwise disposed of and the purchaser assumes the mortgage, the associated extinguishment of the mortgagor's obligation to repay is accounted for in the

---

[13] It might appear unnecessary to add $102.5 Million and then immediately subtract the same amount. Section 752(b) requires us to reduce the partner's outside basis by the total amount of the liability transferred to the partnership, but section 752(a) only requires us to increase the partner's outside basis by his pro rata share of that transferred liability. In this case, the section 752(a) and (b) amounts completely offset each other because GMK happened to own a 99.99% partnership interest in Valiant, which entitled GMK to a 99.99% share of the partnership's liabilities under section 752(a).

computation of the amount realized."). A sale of a partnership interest triggers a deemed discharge of the transferor's share of partnership liabilities. See id. § 1.1001-2(a)(4)(v).

According to the Government, when GMK sold its interest in Valiant to Czerwinski for $1.8 Million, it was also relieved of its share of partnership liabilities, which must be treated as an additional amount realized on the sale. Thus, GMK realized a total of $104.3 Million under section 752(d) when it sold its interest in Valiant to Czerwinski ($1.8 Million promissory note + $102.5 Million relief from its share of partnership liability). GMK's loss is calculated by subtracting its outside basis of $104.5 Million from its amount realized of $104.3 Million, for a total loss of $200,000.

Because it did not treat Valiant's obligation to close the short sale as a liability, GMK calculated the amount realized on the sale as only $1.8 Million. If section 752 were applicable, then GMK would have been attributed a 99.99% share of Valiant's partnership liabilities (i.e. $102.5 Million), and GMK's relief from this liability would have been treated as an additional amount realized under section 752(d).[14] See Treas. Reg. §§ 1.752-1(h) ("If a partnership interest is sold . . ., the reduction in the transferor partner's share of partnership liabilities is treated as an amount realized under section 1001 and the

---

[14] Somewhat confusingly, the IRS made two alternative arguments in the FPAA: (1) GMK's relief from its share of partnership liabilities increased its amount realized under section 752(d); and (2) GMK's relief from its share of partnership liabilities decreased its outside basis in Valiant because the sale of the partnership interest triggered a constructive distribution under section 752(b). Mathematically, the loss calculation is the same, but conceptually, the theories are quite different. Although the Appellants did not clearly distinguish between these two theories in their briefing, the Government has adopted the first theory as its litigating position. We believe that section 752(d), rather than section 752(b), controls the treatment of liabilities when a partner sells his partnership interest in exchange for consideration. WILLIAM S. MCKEE, WILLIAM F. NELSON, & ROBERT L. WHITMIRE, FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶ 16.05[1][b] (2008). To hold otherwise would make section 752(d) "mere statutory surplusage." Id.

regulations thereunder.") (emphasis added). Now we must address which parties' calculation is correct.

E.    The Revenue Rulings

On September 19, 1988, over a decade before the Trust engaged in these transactions, the IRS issued Revenue Ruling 88-77, 1988-2 C.B. 128, 1988 WL 546796, which defined liability under section 752 to "include an obligation only if and to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets (including cash attributable to borrowings)." In this case, the $102.5 Million in cash proceeds from the short sale increased the Trust's outside basis under section 722. The cash received in the short sale was an asset of the partnership, and the basis of the partnership's assets was increased. Thus, under the definition of liability contained in Revenue Ruling 88-77, Valiant's assumed obligation to close the short sale would constitute a liability under section 752.

Citing to Revenue Ruling 88-77, the IRS explicitly stated in 1995 that "[t]he short sale of securities described in this ruling creates a partnership liability under § 752." Rev. Rul. 95-26, 1995-14 I.R.B. 6, 1995 WL 95470 (1995); see also Rev. Rul. 95-45, 1995-1 C.B. 53, 1995 WL 335770 (1995) (applying the same principle to short-sale obligations assumed by corporations). According to Revenue Ruling 95-26, GMK was required to adjust its outside basis "to reflect [its] share of the [partnership] liability under § 752."

Although Revenue Ruling 95-26 did not address the value of the liability, Revenue Ruling 95-45 explicitly held that "the amount of the short-sale liability is the amount of basis to which the short sale gave rise." Stated differently, "[t]he amount of the liability assumed equals the proceeds of the original short sale."[15]    Rev. Rul. 95-45 (regarding short-sale obligations assumed by

---

[15] Although we agree with the district court's ultimate conclusion that the obligation to close a short sale is a liability under section 752, we disagree with its reasoning that "the

corporations); IRS Field Service Advisory, 1997 WL 33313960 (Nov. 21, 1997) (stating that the basis liability principles contained in Rev. Ruling 95-45 are applicable to partnerships "[b]ecause Congress has directed the [IRS] to interpret section 752 consistently with section 357."). Importantly, Revenue Rulings 88-77, 95-26, and 95-45 were issued before the transactions that gave rise to this litigation occurred.

The Appellants argue that the obligation to replace the borrowed securities is not a liability because section 752, which addresses the calculation of a partner's outside basis in a partnership, must be read in conjunction with section 1233, which addresses the calculation of capital gains and losses in short sales. Section 1233(a) states that "gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property . . . used to close the short sale constitutes a capital asset in the hands of the taxpayer."

The Appellants cite to the IRS's implementing regulations, which state that "[f]or income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale." Treas. Reg. § 1.1233-1(a)(1). Because a short sale is an "open" transaction, for which a gain or loss cannot be determined until replacement securities are purchased and delivered to the lender, the Appellants argue that the value of a taxpayer's obligation to deliver borrowed securities is too contingent and indefinite to be determined prior to the date on which the short position is closed.

Based on the short sale taxation principles contained in section 1233, the Appellants argue that the obligation to cover a short position is not a liability for purposes of section 752 because it is a contingent obligation. Because a partner's

---

amount of the obligation became fixed at the moment GMK sold Valiant because at that time GMK could determine its gain or loss on the short sale transaction according to the current market rates for T-Notes." Colm Producer, 460 F. Supp. 2d at 716.

outside basis in his partnership interest is determined "at the time of the contribution," see I.R.C. § 722, the Trust argues that its outside basis in Valiant cannot be adjusted by Valiant's assumed liability (i.e. its obligation to replace the borrowed securities) because the value of this contingent obligation was not ascertainable at the time the brokerage account was transferred from the Trust to Valiant. Citing to several tax court cases and revenue rulings, the Appellants argue that "obligations that are contingent, unmatured, indefinite or executory such that they cannot be taken into account for tax purposes until certain events occur at some point in the future do not constitute liabilities for purposes of I.R.C. § 752." The Appellants argue that the obligation to replace the T-Notes was not a liability under section 752 at the time GMK sold its partnership interest in Valiant, so Czerwinski's assumption of this contingent obligation did increase the amount realized on the sale.

At oral argument, the Appellants asserted that section 1233 defines whether an obligation is a contingent liability for purposes of section 752. The Appellants insist that section 752 must follow section 1233 as night follows day, but we believe that "[our] conclusion that a partnership's short sale of securities creates a partnership liability within the meaning of section 752 . . . does not create tension or conflict with the deferred recognition of gain or loss prescribed for short sale transactions under section 1233." Salina P'ship, 2000 WL 1700928, at *18.[16] Simply put, there is no fundamental link between section 1233, which deals with the calculation of capital gains and losses in short sales, and section 752, which deals with the effect of liabilities on a partner's outside basis. By its own terms, section 1233 does not purport to define the scope of the term "liability" under section 752. We will accord significant weight to the IRS's

_____

[16] Although tax court memorandum opinions have no precedential value in tax court, we have previously relied upon them, which indicates that they hold some persuasive value. See, e.g., Cidale v. United States, 475 F.3d 685, 687 (5th Cir. 2007).

considered judgment (made prior to the transactions as issue in this case) that, in the case of an "open" short sale, the amount of liability assumed for basis purposes equals the proceeds of the original short sale.[17]

Because the sale of a partnership interest is treated as the sale of a unitary capital asset, section 1001 is used to calculate the gain or loss on the sale. Section 1233 plays no role in this case because the gain or loss from the short position in the brokerage account is irrelevant to determining GMK's adjusted outside basis in Valiant. GMK sold its partnership interest in Valiant; it did not close a short sale. While the gain or loss on the short position was certainly relevant to the amount that Czerwinski was willing to pay for Valiant (i.e. the $1.8 Million promissory note), it was not relevant to the calculation of GMK's outside basis in that asset.

The Appellants "treat[] [their] contingent assets and . . . contingent liabilities asymmetrically." See Robert Bird & Alan Tucker, Tax Sham or Prudent Investment: Deconstructing the Government's Pyrrhic Victory in Salina Partnership v. Commissioner, 22 Va. Tax Rev. 231, 254 (2002). If the obligation to replace the borrowed securities was a "contingent liability" that did not increase the amount realized on the sale, then the proceeds from the short sale should also be treated as a "contingent asset" that has no effect on the outside

---

[17] At oral argument, the Government acknowledged that if Valiant had covered the short position before GMK sold Valiant, then GMK's outside basis in Valiant could have been adjusted under section 752(b) to reflect the actual cost of the covering transaction. Although liability changes are theoretically the subject of continuous adjustment, Treasury Regulation § 1.752-4(d) requires that a partner's share of liabilities be calculated only when necessary to determine the tax liability of the partner, such as at the end of the partnership taxable year or when a partner sells his partnership interest. MCKEE ET AL., *supra*, at ¶ 7.02; cf. Gibson Prods. Co. v. United States, 637 F.2d 1041, 1043, 1047 (5th Cir. Unit A Feb. 1981) (holding that the liability on a nonrecourse promissory note was contingent because it consisted mainly of 80% of the future oil and gas production from certain wildcat wells). Unlike the situation in Gibson, the obligation to replace the T-Bills was fixed at the time that the short sale was initiated, and the amount of that liability is governed by Revenue Ruling 95-45. Cf. id. at 1047 (creditor would be paid on the note only "if and when sufficient oil was produced" from the wells).

basis calculation under section 722. The initial short sale that generates the cash proceeds and the subsequent covering transaction are inextricably intertwined. See Zlotnick, 836 F.2d at 820. To treat the $102.5 Million short sale proceeds as an unencumbered cash contribution that increases GMK's outside basis in Valiant without also treating the obligation to close the short sale as a liability flies in the face of reality. The Appellant's failure to treat its relief from partnership liability as an additional amount realized under section 752(d) produced "unwarranted aberrations in the amount of . . . loss realized by the transferor." MCKEE ET AL., supra, at ¶ 7.02[6].

The Appellants argue that Revenue Ruling 95-26 is flawed because it ignores "years of established law providing that a contingent, indeterminate and/or executory obligation is not considered in determining the basis of an asset such as a partnership interest." The Government successfully distinguishes the authorities relied upon by the Appellants in making this argument. Significantly, none of the cases or revenue rulings cited by the Appellants involve a short sale, which we consider a unique transaction.

In Henricks v. Comm'r, 51 T.C. 235 (1968), aff'd 423 F.2d 485 (4th Cir. 1970), the tax court held that the capital losses sustained by the taxpayers in a short sale were deductible in the tax year that the taxpayer actually delivered the securities to the lender to close the short position, not the tax year that the replacement securities were actually purchased by the taxpayer. 51 T.C. at 235. Henricks simply affirms the principle contained in Treasury Regulation § 1.1233-1(a)(1) that a short sale is not consummated until delivery of property to close the short sale; it has nothing to do with the calculation of a partner's outside basis in his partnership interest.

In Helmer v. Comm'r, 34 T.C.M. (CCH) 727 (1975), a partnership received option payments pursuant to an agreement giving a corporation the option to purchase certain real estate. The tax court stated that the option agreement

"created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future. Therefore we hold that no liability arose under section 752 and the partners' bases cannot be increased by such amounts." Id. In Revenue Ruling 73-301, 1973-2 C.B. 215, 1973 WL 33002, the IRS found that unrestricted progress payments on a two-year construction contract are not a liability under section 752 that increases the partner's adjusted outside basis. Importantly, "the partnership had performed all the services required in order to be entitled to receive the progress payment and there was no obligation to return the payment or perform any additional services in order to retain it." Id. Helmer and Revenue Ruling 73-301 are distinguishable from this case because those partnerships did not receive assets giving rise to a partnership obligation.

In Revenue Ruling 57-29, 1975-1 C.B. 519, 1957 WL 11396, the IRS stated that "[i]n computing the cost basis of assets for any purpose, the [IRS] does not recognize an obligation of a taxpayer reflected in an executory contract prior to the performance of the contract." However, in the next sentence, the IRS noted that the executory contract at issue "cost the taxpayer nothing [and] has a zero basis to him" in computing his ultimate gain or loss. Id.

The Appellants seize on general language in Long v. Comm'r, 71 T.C. 1 (1978), aff'd in part and rev'd in part on other grounds, 660 F.2d 416 (10th Cir. 1981), stating that the tax court "has held on a number of occasions that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. We think that partnership liabilities should be treated in the same manner." 71 T.C. at 7-8. However, the claims in Long arose from structural defects in a building that the partnership had erected, and the claims in LaRue v. Comm'r, 90 T.C. 465 (1988) arose from a partnership's contractual obligation to replace missing property. The Government correctly observes that Revenue Ruling 57-29, Long, and LaRue did not involve obligations that created or increased the basis of the partnership assets. For

example, in Long, the tax court held that the taxpayer could not increase his initial outside basis in the partnership until the partnership's contingent liability (a lawsuit) had a liquidated value. 71 T.C. at 8. Before the claim was liquidated, this liability did not create or increase the partner's outside basis in his partnership interest. In contrast, the "contingent liability" in this case immediately increased the Trust's outside basis in Valiant from $2 Million to $104.5 Million.

Under Skidmore, we believe that Revenue Rulings 95-26 and 95-45 are reasonable because they reflect the Commissioner's desire to prevent taxpayers from deducting non-economic losses. Cf. Gregory v. Helvering, 293 U.S. 465, 470 (1935). We do not believe that the Appellants were unfairly surprised or prejudiced by the IRS's challenge to this tax shelter because they were on notice as early as 1988, and certainly by 1995, that the IRS considered the obligation to close a short sale to be a liability under section 752. Revenue Ruling 95-26 is distinguishable from the earlier cases and revenue rulings cited by the Appellants, and it is fully consistent with regulations promulgated by the IRS after 1995. See Treas. Reg. § 1.752-1(a)(4)(i) (adopting the definition of liability contained in Revenue Ruling 88-77).

## III. Conclusion

We conclude that the obligation to close a short sale is a liability for purposes of section 752. We express no opinion on the other issues raised by the parties. We do note, however, that the Seventh Circuit recently held that the offsetting option variant of the Son of BOSS tax shelter was invalid under retroactive Treasury Regulation § 1.752-6. Cemco, 515 F.3d at 752-53. By its own terms, this treasury regulation only applies if a partnership assumes a liability of a partner "other than a liability to which section 752(a) and (b) apply." Treas. Reg. § 1.752-6(a). Because we find that the obligation to close a short sale

29

is a liability to which section 752(a) and (b) apply, we conclude that this regulation is inapplicable to this case.[18]

AFFIRMED.

---

[18] According to the Government, the IRS promulgated this retroactive regulation to address tax shelters involving contingent liabilities that fall outside the purview of section 752.

KING, Circuit Judge, concurring:


I concur in the judgment of the panel and in the panel's opinion.  I write separately to express my unease with what we have been asked to do here.  The basic problem with this case is that the underlying transactions have absolutely no economic substance.  The Internal Revenue Service seeks a rule of law from a circuit court to dispose of this case, and others, without being put to the expense and delay of litigating the fact-bound question whether these transactions should be recharacterized for tax purposes under the no-economic-substance and step-transactions doctrines.  The result is a rule of law addressing what is here a pretense, an unsettling undertaking.